**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

*Patricia McLane*  
*Assistant United States Attorney*  
*Patricia.McLane@usdoj.gov*

*Suite 400*  
*36 S. Charles Street*  
*Baltimore, MD 21201*

DIRECT LINE: 410-209-4942  
MAIN: 410-209-4800  
FAX: 410-962-9293

May 14, 2025

The Honorable Stephanie A. Gallagher  
United States District Judge  
United States Courthouse  
101 W. Lombard Street  
Baltimore, Maryland 21201

      Re:    <u>Sentencing in United States v. Ziyon Thompson</u>  
              Crim. No. SAG-22-206

Dear Judge Gallagher:

     The United States writes in advance of sentencing in the above-captioned case, currently scheduled for June 3, 2025. A sentence of no less than 300 months (25 years) is sufficient but not greater than necessary to comply with the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## **INTRODUCTION**

     The crime for which the Defendant plead guilty in this case stems from the gruesome murder of Miguel Soto-Diaz, who was lured from California to the District of Maryland in order to be held for ransom. When the kidnappers' demands were not met, Miguel Soto-Diaz was shot five times before being found in a burnt down row home in Baltimore City.

     Now, Miguel Soto-Diaz's young son lacks a father, and his wife has lost her life partner. The Defendant has admitted his participation in this heinous crime ending the life of Miguel Soto-Diaz no matter who else participated in the crime.

     While the Government does not aver that the Defendant acted alone, his overall culpability is undisputed: the Defendant started a marijuana dealing business with the victim; complained about the quality of the marijuana, in turn forming a ruse with which to lure Miguel Soto-Diaz to visit Maryland to check on the business; bought a "burner phone" in order to avoid detection and contact Miguel Soto-Diaz's family in an effort to demand marijuana and money for his safe return to California; flaunted the purchase of duct tape substantially similar to the duct tape observed in "ransom photos" sent to the victim's family; then drove the victim to 325 Furrow Street, in Baltimore City, on May 8, 2022, where some hours later Miguel Soto-Diaz was ultimately shot and then left in the home as it burned.

**FACTUAL BACKGROUND**

The plea agreement entered in this case contains the following stipulated facts (ECF# 65):

In late April 2022, the Defendant, Ziyon Thompson, travelled from Baltimore, Maryland to California to meet with Miguel Soto-Diaz, A.M., and W.M. The Defendant stayed with the Soto-Diaz family and visited the family's marijuana "farm". The Defendant agreed to sell Soto-Diaz's marijuana in Maryland during the visit.

Soto-Diaz and A.M. arranged for the delivery of marijuana from California to Maryland by A.F in early May 2022. A.F. flew to Baltimore from California and met with the Defendant. She gave the Defendant a suitcase full of marijuana. The Defendant agreed to sell the marijuana on consignment and would pay Soto-Diaz later. The Defendant agrees that he possessed this marijuana with intent to distribute it.

Soto-Diaz travelled to Baltimore on May 7, 2022, to meet with the Defendant and discuss additional deliveries of marijuana and collect the money from the marijuana A.F. delivered to the Defendant on consignment. Soto-Diaz did not speak English, so A.M. translated over text, phone calls, and Facetime for Soto-Diaz when he communicated with the Defendant both before and during the May trip. The Defendant used one number to communicate with Soto-Diaz/A.M. before Soto-Diaz's trip to Baltimore. The Defendant purchased a second phone the day before Soto-Diaz arrived in Baltimore. The Defendant used the second phone to communicate with A.M. after Soto-Diaz arrived in Baltimore for the meeting. The Defendant picked up Soto-Diaz from the Baltimore Washington International airport on May 7, 2022, and delivered him to a hotel in the Inner Harbor.

On May 8, 2022, the Defendant picked up Soto-Diaz in the afternoon and brought him to 325 Furrow Street, Baltimore, Maryland. Around 3 p.m. the Defendant placed a call to A.M. via FaceTime. During the call, the Defendant showed Soto-Diaz tied to a chair with duct tape over his mouth and zip-ties on his hands and ankles (depicted below). The Defendant demanded 200 pounds of marijuana and $50,000 for the safe return of Soto-Diaz.



At approximately 7:03 p.m. that same day, firefighters from the Baltimore Fire Department ("BFD") responded to 325 Furrow Street, Baltimore, Maryland in response to a house fire. BFD officers found Miguel Soto-Diaz dead inside with multiple gunshot wounds. Baltimore Police Department Homicide Unit detectives also responded and recovered a gas can and five 9mm shell casings.

BFD investigators ruled that the fire was intentionally set. Soto-Diaz's body was examined by the Office of the Medical Examiner. Dr. Morris ruled the manner of death as a homicide; the cause of death was the multiple gunshot wounds to the body rather than any carbon monoxide inhalation, indicating Soto-Diaz died before the fire began. The Defendant agrees it was reasonably foreseeable that Soto-Diaz would be killed during the extortion.

The Defendant further agrees that the shooting of Soto-Diaz was during and in relation to the Defendant's possession with intent to distribute marijuana, and that the shooting resulted in the death of Soto-Diaz.

Evidence would include testimony about phone conversations between A.M. and the Defendant about a ransom for the safe return of Mr. Soto-Diaz and text messages, including one from the Defendant to A.M. stating, "Papi said send the bags and money so he can be ok and he said don't call the police or he want [sic] be coming home. We had a long conversation. 200 bags and 50k."

Other evidence would include historical cell site data placing the Defendant in and around 325 Furrow Street during the text conversations with A.M., video of the Defendant purchasing the second phone, and social media and other phone evidence connecting the Defendant, Soto-Diaz, and A.M. regarding the intention to engage in drug trafficking.

### SENTENCING GUIDELINES AND CRIMINAL HISTORY CALCULATION

The parties also do not agree on the Sentencing Guidelines calculation as presently outlined in the PreSentence Report ("PSR"), based on the facts and stipulations contained in the Defendant's plea:

- There is no agreement on the applicable base offense level:
    - The Government contends that the applicable base offense level is forty-three (43) pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 2A1.1 and 2X2.1; and,
    - The Defendant contends that pursuant to U.S.S.G. § 2A1.1 application note 2(b) that a downward departure is appropriate because the Defendant did not cause the death intentionally or knowingly.

- There is no agreement as to whether a **2-level** increase in the base offense level pursuant to U.S.S.G. § 3A1.3 is applicable.
    - The Government contends the increase applies because the victim was bound to a chair and further incorporates their argument from the PSR; and
    - The Defendant reserves the right to oppose that increase.

The parties filed support for their respective positions on the first issue with the United State's Probation Office, which the Government incorporates here. Notably, the PSR calculates the guidelines in accordance with the Government's calculation. ECF 68 at ¶ 30.

Regardless of the Court's ruling on these issues, the Government does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a); and the Government will make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease, on account of the Defendant's acceptance of responsibility.

Finally, there is no agreement as to the Defendant's criminal history. The PSR calculates the Defendant's criminal history category is II, and the Government has no objection to that calculation. *Id.* at ¶ 35.

Accordingly, with a total adjusted offense level of 42 and a criminal history category of II, the Defendant's advisory sentencing guidelines range is 360 months to life. *Id*. at ¶ 81. The PSR notes that the Defendant was in continuous custody on this matter from June 8, 2022. *Id*. at p. 1. The Government has calculated that the Defendant has therefore spent approximately 1,080 days in custody on this matter.

## FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

A downward variant sentence of 300 months' incarceration is sufficient but not greater than necessary considering the factors set forth in Title 18, United States Code, Section 3553(a), and accounts for the actions of the Defendant as it pertains to the instant offense, *regardless* of any others involved.[1]

### Nature and Circumstances of the Offense (3553)(a)(1))

Murder is widely accepted as the most egregious crime. It robs families, and their communities, of loved ones, and it further puts others in danger. Here, we have a family that lost a father, husband, and caregiver. The Defendant's actions put others in danger by participating in an ongoing crime that ultimately resulted in setting a building on fire, the result of which could have easily caused additional damage to property and endanger the lives of neighbors. The fact that this murder occurred after sustained torture and restriction of the victim's freedom is all the more egregious because the underlying plot was nakedly based on the proliferation of controlled substances, and pecuniary gain.

The Court should not credit the Defendant with any claim that he was not present at the time of the murder. There is no evidence in the stipulated facts of this case to suggest that the

---

[1] The Government has always believed that at least two other people assisted the Defendant on May 8, 2022, due to the violent nature of the murder, and information gleaned throughout the course of this investigation. Agents recently identified a possible second suspect involved in this offense; the Government provided timely information to the Defendant's counsel. The Government will continue to investigate this individual and any others (if identified) to hold all those responsible for the death of Miguel Soto-Diaz. This information does not impact the Government's position on the Defendant's culpability, nor does it similarly disturb the Government's position that the exact location of the Defendant at the time of the victim's death is factually unclear.

Defendant was conclusively absent at the time Miguel Soto-Diaz was shot five times. While the Defendant is free to argue for any mitigating factors at sentencing, the Defendant should not be permitted to advance facts that are not in evidence, or not contemplated in either the plea agreement that the Defendant voluntarily entered into, nor put forth in the PSR before the Court.

### History and Characteristics of the Offender (3553(a)(1))

June 3-4, 2022, Suspected Firearms Possession

The murder of Miguel Soto-Diaz did not make the Defendant circumspect. Rather, he continued to dismiss the law and possess handguns. On June 3, 2022, BPD officers were monitoring the Defendant's Instagram account and observed that the Defendant was hosting a social event at Club Medusa in Baltimore. At approximately 9:15 p.m., the Defendant posted a video of himself and two other individuals driving in what appeared to be a 2-door Mercedes.

The Defendant held what officers recognized as an "AK-47" style pistol with a "banana" style magazine. The Defendant's passenger, D.N., held what officers recognized as an "AR-15" style firearm with a large drum magazine and a red laser. The Defendant is on the right:

 

BPD officers established surveillance at Club Medusa. At approximately 11:15 p.m., a 2-door Mercedes arrived at the club with the Defendant and D.N. who then entered the club. At approximately 1:20 a.m. (now June 4, 2022), both men returned to the vehicle and drove away from the club. BPD attempted to stop the Mercedes. Both men bailed out of the car and fled on foot. BPD apprehended D.N.; however, the Defendant escaped. BPD recovered an "AR-15" style firearm from the backseat floorboard with a loaded 100-round drum magazine and two back-packs containing over 1,800 grams of suspected marijuana. Officers also recovered the Defendant's driver's license, and a title and bill of sale for the Audi in the Defendant's name. The items are depicted below:



The Defendant was not deterred by his participation in the May 2022 murder of Miguel Soto-Diaz, in that he acquired another firearm by June 6, 2022. Officers executed a search warrant on a residence where the Defendant stayed. Agents also recovered a Glock 9mm firearm the Defendant threw out the bedroom window when agents breached the door of the apartment. This is the same type of firearm used to kill Miguel Soto-Diaz although there is no evidence to support it is the same weapon.

Defendant's Criminal History Involving Firearms Offenses

In 2020, the Defendant was convicted of possession of a loaded handgun. *Id.* at ¶ 34. This conviction forecasted other choices the Defendant would make both in this case on May 8, 2022, and June 3-4, 2022. The Defendant clearly knows about, desires, and wants to possess firearms.

## CONCLUSION

In crafting the Defendant's sentence, the Court should take into account the overall criminal conduct in relation to the Defendant's criminal history and his propensity for rehabilitation. A sentence of 25 years is warranted due to the nature and circumstances of this ruthless offense, to provide just punishment and a measure of justice to the victim's family, as well as to account for the history and characteristics of the Defendant.

For all the reasons advance in this memorandum, and further to arguments put forth at the sentencing hearing, the Government respectfully requests that the Court impose a sentence of 25 years (300 months) as to this Defendant.

Respectfully submitted.

Kelly O. Hayes
United States Attorney

*/s/Patricia McLane*_____
Patricia McLane
Alex Kalim
Assistant United States Attorneys