# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No.  SAG-22-0206** |
| | : | |
| **ZIYON THOMPSON,** | : | |
| | : | |
| **Defendant.** | : | |

---

### DEFENSE SENTENCING MEMORANDUM

Ziyon Thompson has deep remorse for the role he played in the death of Miguel Soto-Diaz. Mr. Thompson was not present when Mr. Soto-Diaz was killed, and he did not intend Mr. Soto-Diaz's death.  Nonetheless, he knows he is morally and legally responsible for a death that deprived a loving wife of her husband and a child of his father, and he tears up when discussing Mr. Soto-Diaz, his wife and child.



*Mr. Thompson with his father, Eric Thompson-Bey and twin sisters, Eriel and Erica.*

Mr. Thompson's remorse is genuine.  He is not the thug the Government contends, but rather he was a 21-year-old with untreated ADHD whose history of adverse childhood experiences and susceptibility to his environment caused him to engage in a course of conduct without due regard for the potential consequences.   Mr. Thompson's older sister Erica Vaughn writes, he was "a young man who was dealt one of the hardest hands in life but who has always managed to be a source of light,

laughter, and love." **Exhibit 1** (Letter of Erica Vaughn). Although "poverty was all that we knew," and the "crime and bad way of life" that surrounded them "seeped into Ziyon's mind before he even had a chance," Mr. Thompson's sister Eriel, Erica's twin, explains that Mr. Thompson, whose judgment was clouded by the need for "instant gratification," is "not a bad person." **Exhibit 2** (Letter of Eriel Thompson). Indeed, from the time of his arrest, Mr. Thompson has expressed to counsel genuine sorrow for his role in Mr. Soto-Diaz's death—not because it landed him in custody facing decades in prison, but rather because Mr. Soto-Diaz died, and his family must go on without him.

Because Mr. Soto-Diaz's life was taken, the parties agree that the starting point for the Guidelines is § 2A1.1. Plea Agreement (ECF 65) ¶ 6(b). But the Defense does not agree that the base offense level should be 43, and preserved the right to seek a downward departure pursuant to Application Note 2(B) to Guideline § 2A1.1. *Id*. Application Note 2(B) pertains to "Felony Murder" and recognizes that a downward departure is appropriate when, as is the case here, "the defendant did not cause the death intentionally or knowingly." The rationale for a downward departure in cases of felony murder is particularly strong when the defendant is a juvenile or in their mid-20s, which Guideline § 5H1.1 recognizes to be a period of diminished culpability due to youthfulness. As Justice Bryer explained in a concurring opinion in *Miller v. Alabama*, one of the seminal cases on the culpability of young people:

> At base, the theory of transferring a defendant's intent is premised on the idea that one engaged in a dangerous felony **should understand** the risk that the victim of the felony could be killed, even by a confederate...Yet the ability to consider the full consequences of a course of action and to adjust one's conduct accordingly is precisely what we know juveniles lack capacity to do effectively.

567 U.S. 460, 492 (2012) (Breyer, J., concurring) (citing majority at 470-473) (emphasis

added).

This memorandum will discuss the applicability of Note 2(B) in three parts:

**<u>First</u>**, the memo will walk through key evidence provided in discovery and argue how it supports what the Defense has always maintained: that Mr. Thompson "did not cause [Mr. Soto-Diaz's] death intentionally or knowingly." U.S.S.G. § 2A1.1 n. 2(B). Historical cell-site data indicates that Mr. Thompson was not present at 325 Furrow Street, the location where Mr. Soto-Diaz was killed, in the **80 minutes** before his body was found. Significantly, the Government learned in February of a credible confession in which an individual admitted to fatally shooting a victim during a struggle that matches the date and circumstances of Mr. Soto-Diaz's death. This and additional discovery, taken together, supports the conclusion that Mr. Thompson was not present when Mr. Soto-Diaz was killed in a struggle and not as part of a plan.

**<u>Second</u>**, the memo will explain that at the time of the offense, Mr. Thompson was a 21-year-old "with longstanding neurodevelopmental challenges, including ADHD, learning disorders, and intellectual impairments, shaped by early lead exposure and significant childhood adversity (i.e., Adverse Childhood Experiences, or ACEs)." **Exhibit 3** at 1 (Expert Report of Jonathan DeRight, Ph.D). Dr. DeRight's report explains that Mr. Thompson's "ADHD affects not only attention but also impulsivity, problem-solving, learning, and emotional regulation, with research showing his executive maturity likely lags behind his chronological age." *Id.* Due to Mr. Thompson's age and ADHD, he participated in this conspiracy without duly considering the ways it could go horribly awry. Or in the words of Justice Breyer, he lacked "the ability to consider the full consequences of a course of action and to adjust [his] conduct accordingly." *Miller*, 567 U.S. at 492 (Breyer, J., concurring). Accordingly, the Court should grant a significant

downward departure under Application Note 2(B).

**Third**, the memo explains how the Guidelines should be calculated with the downward departure under Application Note 2(B).

Mr. Soto-Diaz's death is an unmitigated tragedy. But the Court must balance his death against several mitigating factors, including that Mr. Thompson did not intend the victim's death; his youth, unmedicated ADHD and opiate abuse at the time of the offense; and his history of Adverse Childhood Experiences. Given these mitigating circumstances, no matter what the applicable guidelines range, the Court should sentence Mr. Thompson to the bottom of the 20- to 25-year range agreed to by the parties pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). A sentence longer than 20 years would be greater than necessary to meet the purposes of sentencing under these circumstances and would be akin to sentences received by individuals who do not have the same mitigating circumstances as Mr. Thompson.

## I.    A Downward Departure Is Appropriate Under Application Note 2(B) to § 2A1.1 Because Mr. Thompson "Did Not Cause the Death Intentionally or Knowingly."

Mr. Thompson pled guilty to aiding and abetting the use of a firearm resulting in death during and in relation to a drug trafficking crime, but he did not admit to being the shooter, and the Defense preserved the right to argue that a downward departure is appropriate under Application Note 2(B) to U.S.S.G. § 2A1.1. Plea Agreement ¶ 6(b). The full text of Application Note 2(B) to § 2A1.1 states:

> **Felony Murder.—**If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. For example, a downward departure may be warranted if in robbing a bank, the defendant merely passed a note to the teller, as a result of which the teller had a heart attack and died. The extent of the departure should be based upon the defendant's state of mind (*e.g.*, recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However, departure below the minimum guideline sentence

provided for second degree murder in § 2A1.2 (Second Degree Murder) is not likely appropriate. Also, because death obviously is an aggravating factor, it necessarily would be inappropriate to impose a sentence at a level below that which the guideline for the underlying offense requires in the absence of death.

The focus on intent and the state of mind of the defendant is particularly important when sentencing young people because elsewhere the Guidelines recognize that youthful offenders, including those in their early 20s, are less culpable than adults due to several factors endemic to youth. More specifically, Guideline § 5H1.1 states:

A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk seeking, and susceptible to outside influence as their brains continue to envelope into young adulthood. Youthful individuals also are more amenable to rehabilitation.

U.S.S.G. § 5H1.1.

Mr. Thompson has accepted responsibility for Mr. Soto-Diaz's death under a felony murder theory. In more human terms, he feels moral responsibility for Mr. Soto-Diaz's death. But he did not intend for Mr. Soto-Diaz to die nor is he the one who killed him. Due to his age, long history of unmedicated ADHD and abuse of opiates and lean, he participated in a scheme without due regard for what could go wrong. Based on the facts of this case and the realities of youth recognized in § 5H1.1, a downward departure under Application Note 2(B) is warranted. With the downward departure, Mr. Thompson's total offense level should not be higher than a 35.

### A. Evidence from Discovery Shows Mr. Thompson "Did Not Cause the Death Intentionally or Knowingly."

At the outset, it is worth noting that Mr. Thompson had no incentive to kill Mr.

Soto-Diaz or want him dead because Mr. Thompson's identity was well-known to Mr. Soto-Diaz and, more importantly, to his stepson A.M. who was in California out of harm's way. Mr. Thompson communicated with A.M. throughout May 7, 2022, and May 8, 2022, via phone call and FaceTime and, as such, he well knew he would be the person A.M. could identify either to law enforcement or to those willing to engage in vigilante justice. Thus, it was in Mr. Thompson's self-interest for Mr. Soto-Diaz to be returned safely to his family.

The evidence from discovery strongly supports what the Defense has always maintained: Mr. Thompson did not intend Mr. Soto-Diaz's death, he was not present when he was shot, and he did not learn of the killing until hours after the fact. Because the facts necessary to this analysis are beyond what was included in the Statement of Facts to the plea agreement, this section will discuss evidence from discovery. To be clear, the Defense is not relitigating the Statement of Facts—we agree with everything therein. Rather, we are expanding on the Statement of Facts. Everything referred to in this section comes directly from materials provided by the Government over the past three years, including, but not limited to, a draft FBI CAST (Cellular Analysis Survey Team) report of historical cell-site data for multiple phones, the forensic download of A.M.'s phone, surveillance footage, and various police and forensic reports. The Defense will have the relevant discovery available and labeled as exhibits at the sentencing hearing should the Government or Court want them formally introduced into evidence.

The Statement of Facts sets out that Mr. Thompson spent a few days in April 2022 in California with A.M. and the family seeing their marijuana grow operation. Within days of Mr. Thompson's visit, A.M. and Mr. Soto-Diaz sent a courier on a flight to Baltimore with luggage filled with marijuana. Mr. Thompson picked her—and the

marijuana—up at the airport. Mr. Soto-Diaz traveled to the East Coast in early May 2022, first going to Charlotte, North Carolina, and then traveling to Baltimore.

On May 7, 2022, Mr. Thompson bought the 6182 phone number, and within 15 minutes of the purchase, placed a call to A.M. He did not disguise his identity at all, and A.M. saved the new number in his phone. Thus, contrary to the Government's assertion, Mr. Thompson did not try to "avoid detection." ECF No. 71 at 1. Mr. Soto-Diaz arrived at BWI around 10 p.m. on May 7, 2022. A.M. and Mr. Thompson, using 6182, coordinated Mr. Thompson picking up Mr. Soto-Diaz at BWI. The historical cell-site data for 6182 showed Mr. Thompson in the area of BWI, and Mr. Soto-Diaz sent a video to A.M. or W.M., Mr. Soto-Diaz's wife and A.M.'s mother, of Mr. Thompson, undisguised in the driver's seat giving a thumbs up, having just picked up Mr. Soto-Diaz. Mr. Thompson then "delivered him to a hotel in the Inner Harbor." Statement of Facts.

Around 1:22 p.m. on May 8, number 6182 returned to the area of the hotel and then both 6182 and Mr. Soto-Diaz's phones traveled to West Baltimore. Around 2:04 p.m., Mr. Soto-Diaz's phone utilized the cell tower closest to 325 Furrow Street, the house where the fire department found Mr. Soto-Diaz dead. Mr. Soto-Diaz's phone was still there at 2:05 p.m. The next mappable activity from Mr. Soto-Diaz's phone did not occur until 11:04 p.m., according to the FBI CAST team. The 6182 number utilized the cell tower closest to 325 Furrow Street at 2:05 p.m. By 2:17 p.m., the 6182 number was utilizing towers a few miles away, north of Route 40 (325 Furrow Street is south of Route 40). Then at 3:08 p.m., number 6182 utilized the cell tower closest to 325 Furrow Street and continued utilizing that tower through 5:31 p.m.

Around 3:35 p.m., A.M. communicated via FaceTime with 6182 during which Mr. Thompson demanded marijuana and money for the safe return of Mr. Soto-Diaz. They

communicated again by FaceTime at 4:08 p.m., 4:11 p.m. and 4:14 p.m.  At 4:14 p.m., Mr. Thompson sent A.M. from 6182 the text, "Papi said send the bags and money so he can be ok and he said don't call the police or he want be coming home."  He then sent a photo of Mr. Soto-Diaz in a chair with his hands and feet zip-tied and duct tape over his mouth. Mr. Thompson then sent the text: "We had a long conversation.  200 bags and 50K."  Mr. Thompson and A.M. had a lengthy phone call at 4:17 p.m. and spoke again at 5:05 p.m., 5:09 p.m., 5:26 p.m. and 5:31 p.m.  According to A.M.'s cell phone, the two did not talk again until 8:04 p.m.  They spoke again via FaceTime at 8:05 p.m. and then not again until 11:26 p.m.  These calls all were between A.M.'s cell phone and 6182—thus the Government's theory has always been, and the Defense has conceded, that Mr. Thompson was the person in possession of the 6182 cell phone.

At approximately 7:03 p.m., someone called 911 and reported a fire at 325 Furrow Street.  The Fire Department arrived around 7:07 p.m.  The Fire Department found Mr. Soto-Diaz in the house dead.  Although Mr. Soto-Diaz's body was badly burned in the fire, the Office of the Chief Medical Examiner concluded he died from "multiple gunshot wounds" before the fire because there was no "soot deposition" in his airways.  A Fire Department investigation concluded that, given the presence of accelerants, someone started the fire.

**The FBI CAST report makes clear that by 5:45 p.m., the 6182 cell phone was no longer utilizing the tower closest to 325 Furrow Street and it never returned to utilizing that tower.**  Mr. Thompson had an older phone number: 410-725-1786.  That phone, too, put Mr. Thompson north of 325 Furrow Street by 6 p.m.  By 8:30 p.m., both of Mr. Thompson's numbers were in Charles Village/Remington/Mondawmin—far from 325 Furrow Street.  He then drove to

Salisbury on the Eastern Shore of Maryland, before returning to the city at almost 2 a.m. and stopping at Italiano's Restaurant on Washington Boulevard.

Based on this information, the Defense maintains that, consistent with this cell-site data, Mr. Thompson could not have been the person who set the fire nor was in the house at the time Mr. Soto-Diaz was shot. While theoretically it is possible that Mr. Soto-Diaz was killed before 5:45 p.m., a phone call between Mr. Thompson and A.M. strongly suggests that at 11:26 p.m., Mr. Thompson did not know Mr. Soto-Diaz was dead. Furthermore, post-plea developments in the Government's investigation substantiate the Defense position that Mr. Thompson was **not** the shooter and that the shooting was not premeditated and certainly not intended by Mr. Thompson.

As previously mentioned, A.M.'s phone lists a call with 6182 at 11:26 p.m. Cell-phone records for 6182 note the call as well. Historical cell-site data shows that Mr. Thompson was in Salisbury, Maryland, at the time of the call. By that time, A.M. had gone to the local police department in California and made the call from a recorded interrogation room. As a result, a recording of the 11:26 p.m. call exists. (The Defense will have the recording of the approximately six-minute call available on June 3 should the Court like to listen to it.) Mr. Thompson's voice can be heard clearly in the recording, although A.M.'s is muffled. Mr. Thompson says, "just get the shit here; he's coming the f**k home." It's hard to discern what A.M. says in response, but it sounds like he says he has talked with a courier to make the arrangements. Mr. Thompson then says, "Alright, well you're not going to be able to talk to pop tonight because I'm already gone now. You should have told me. You should have kept it 100 with me bro that you was out to eat with your mother. [difficult to discern] You should have said that so I could have let Pop talk to you while I was there. I'm all the way home now." A.M. says his mom is worried

that she hasn't heard from Mr. Soto-Diaz and reminds him she's pregnant.   Mr. Thompson says, "I know.   I understand."   He then says, "You're going to have to wait now until the morning.   I'm gone now.   I told you that."   A.M. again says his mom wants to speak to Mr. Soto-Diaz, and Mr. Thompson says, "I'll do it myself.   And then tomorrow, I'll just have him call her."   It's hard to understand what A.M. then says, but Mr. Thompson reminds him to send the phone number of the courier.   They talk more, and A.M. says, "he's a good man."   Mr. Thompson responds, "I didn't do nothing to him.   He good.   He good."   At the end of the call, he says just get him the phone number, "so Pops can be on his way home."   It sounds like Mr. Thompson believes (1) that A.M. is sending a courier the next day with the marijuana and cash; and (2) that he will be able to put A.M. on the phone with Mr. Soto-Diaz in the morning.

In footnote 1 to its sentencing memo, the Government states "it has always believed that at least two other people assisted the Defendant on May 8, 2022."   ECF No. 71 n.1. Until recently, the Government had not been able to determine who the other individuals were.   However, as referenced in footnote 1 to the Government's sentencing memo, "[a]gents recently identified a possible second suspect involved in the offense," and Government counsel provided some of the information to Defense counsel.   Apparently, in February, a witness came forward who had not previously come up in the ATF's investigation.   The Defense does not know the identity of the witness, but from what the Government disclosed, it appears this is a highly credible source who does not have a criminal case pending and is not seeking any benefit for coming forward.   The witness apparently told the BPD and then the ATF that they had seen an individual on the night of May 8, and his head was bandaged.   This individual ultimately went to the hospital. The individual later confessed to the witness that he had been involved in an incident that

had made the news—the story about a man who was killed and burned on May 8. He said that the victim had hit him on the head, and then was on top of him, so he shot the victim. According to the witness, the confessor claimed that the incident was his idea.

Using this lead, the ATF identified two phone numbers associated with the confessor. One phone number utilized the cell tower closest to 325 Furrow Street from 2:11 p.m. to 6:50 p.m. on May 8; the other phone number utilized the cell tower closest to 325 Furrow Street from 12:43 p.m. to 7:04 p.m. on May 8—minutes before the Fire Department arrived. The Government also obtained medical records for the confessor, indicating an injury and hospital visit consistent with what the witness described.

While the Government is still investigating, this new evidence supports the Defense position that Mr. Thompson did not shoot Mr. Soto-Diaz. It further substantiates that the shooting was not premeditated. The confessor purportedly said he shot the victim when the victim attempted to free himself—and medical records are consistent with the witness's account of the confessor's injuries from the ensuing clash. This indicates that the shooting was not planned or intended but a split-second reaction. Indeed, crime scene evidence supports this account. A photograph of Mr. Soto-Diaz's body in the ambulance shows his feet bound but not his hands. The Baltimore Police Department crime scene unit collected one closed zip tie (and three open zip ties) from inside 325 Furrow Street, suggesting that Mr. Soto-Diaz may have gotten his hands free from an engaged zip tie. Furthermore, the location of Mr. Soto-Diaz's gunshot wounds (head, cheek, left thigh, right thigh and right middle finger) is more consistent with a struggle than an execution.

It makes far more sense that Mr. Soto-Diaz was killed in a struggle than with premeditation. Mr. Thompson, having traveled to California before to see Mr. Soto-Diaz

and A.M., and having received a shipment of marijuana in April via a courier sent by Mr. Soto-Diaz and A.M., knew that it would take until at least May 9 before the marijuana and money demanded could arrive in Baltimore. The ransom demand was made at 3:30 p.m. on May 8; the photograph of Mr. Soto-Diaz was sent at 4:14 p.m.; the fire department arrived a little after 7 p.m. No one could believe that the marijuana and money would make its way to Baltimore from California that quickly, and although A.M. went to the police, he had told Mr. Thompson that he was sending a courier. A.M.'s phone included the photograph of an itinerary for a named individual to travel from California to Baltimore via Chicago late in the evening on May 8, arriving in Baltimore the morning of May 9 and returning to California on May 10. That's why Mr. Thompson left 325 Furrow Street and went about his business.

Furthermore, as stated previously, Mr. Thompson—as the one person A.M. clearly knew was involved in the scheme—had every incentive for Mr. Soto-Diaz to return to his family safely. Mr. Thompson was communicating by phone (where A.M. could hear his voice) and by FaceTime (where A.M. could see his face). Mr. Thompson could not possibly have intended for Mr. Soto-Diaz to be killed, as he would be the person who would be identified as involved in the scheme should A.M. go to the police or turn to vigilante justice. When all of this is taken together, the most plausible synthesis of all the evidence—old and new—is that after Mr. Thompson left 325 Furrow Street, Mr. Soto-Diaz got free, a struggle ensued, and he was killed by others in the house with him. Given the historical cell-site data and Mr. Thompson's 11:26 p.m. call with A.M., the evidence suggests Mr. Thompson was not present when Mr. Soto-Diaz was killed and had not even learned yet that he had been killed. Indeed, at the time of the call, medical records place the confessor at the hospital.

To be clear, the Defense is not contending that this new information absolves Mr. Thompson of legal responsibility for Mr. Soto-Diaz's death.  He is responsible for Mr. Soto-Diaz's death under the legal principle of felony murder, and this new information is consistent with the Statement of Facts.  What the new information—coupled with the historical cell site data and the 11:26 p.m. call with A.M.—shows is that Mr. Thompson "did not cause the death intentionally or knowingly."  U.S.S.G. § 2A1.1 n. 2(B).  As such, pursuant to Application Note 2(B), a downward departure is warranted.

> **B.    Mr. Thompson's Cognitive Profile Indicates that He Did Not Think Through the Potential Consequences of the Scheme.**

The evidence from discovery, and the logical inferences that can be drawn from that evidence, coupled with Mr. Thompson's neurocognitive profile, justifies a significant downward departure under Application Note 2(B) to § 2A1.1.  As the discussion below explains in detail, Mr. Thompson was 21 years old at the time of the offense, well within the period of brain development recognized in 5H1.1.  Dr. DeRight's report explains the science underlying the recognition in § 5H1.1 that during adolescence and young adulthood (until around age 25), the brain goes through a period of "construction" that makes young people "vulnerable to bad decisions."  **Exhibit 3** at 4.  In this period, the neurotransmitters associated with reward and motivation increase "while the chemicals that have to do with thinking and putting the brakes on actions stay relatively low."  *Id.* at 5.  Dr. DeRight explains that "[a]dolescents often struggle with decision-making because their brain regions responsible for impulse control and foresight are still maturing, making them more prone to prioritize immediate rewards over long-term consequences."  *Id.* at 6.  Dr. DeRight further explains that these problems endemic to young people are exacerbated by ADHD.  "Even compared with their age-matched peers, adolescents with

ADHD are well known to be more prone to risky and impulsive decisions that favor immediate gratification over long-term soundness.  This dynamic is beginning to be understood as a problem related to suboptimal decision making rather than a general tendency to be 'riskier.'"  *Id.* at 7.

At the time of the offense, Mr. Thompson had a long history of untreated ADHD and a serious opioid, lean and marijuana addiction.  He also had experienced numerous Adverse Childhood Experiences ("ACEs"), one of the factors enumerated in § 5H1.1.  ACEs are a group of 10 potentially traumatic experiences that can occur in early childhood, including different types of abuse, household challenges, and neglect.  The Commission included them in § 5H1.1 consistent with research showing these experiences can have long-term, negative impacts, with negative outcomes more likely for people who have experienced multiple ACEs.  Data from the original CDC-Kaiser ACE study found that only 12.5% of participants experienced four or more Adverse Childhood Experiences.[1] Mr. Thompson has experienced at least four.

Finally, another factor recognized by § 5H1.1 is that young people are less able to escape their environment—and as both his sisters make clear in their letters, Mr. Thompson's conduct must be understood in the context of the poverty-stricken and crime-infested neighborhoods where they grew up.  Viscerally and poignantly, Erica explains that after giving birth to her son, she decided she had to leave Baltimore because she "was terrified of raising a son in Baltimore City."  **Exhibit 1** at 2.

Thus, Mr. Thompson's young life exemplifies the factors § 5H1.1 recognizes as relevant to culpability, a significant consideration for the Court when considering a

---

[1]    About the CDC Kaiser ACE Study:
https://www.cdc.gov/violenceprevention/aces/about.html.

downward departure under Application Note 2(B) to § 2A1.1.  And, of course, the Court must consider Mr. Thompson's history and characteristics when determining the appropriate sentence under 18 U.S.C. § 3553(a).

> ### 1.    Although loved by both his parents, their limitations deeply affected Mr. Thompson and his sisters' childhoods, causing him to experience several Adverse Childhood Experiences (ACEs).

Ziyon Thompson was born on September 10, 2000, in Baltimore to Mary and Eric Thompson.[2]  He was the youngest of three maternal half-siblings, three paternal half-siblings, and twin sisters Erica and Eriel, who had the same parents.  Both of Ziyon's parents will be in Court for his sentencing, and his father, who will address the Court, has been a steadfast source of support throughout Ziyon's incarceration.  Ziyon now refers to his father as his "best friend."  But, as the twins describe in their letters, their parents had their own struggles that limited their emotional and physical availability to provide what their children needed when they were young.  Erica writes: "From as far back as I can remember, it was just the three of us—me, my twin sister Eriel, and Ziyon.  We were the youngest of nine and often left to figure life out on our own."  **Exhibit 1** at 1.

Although Ziyon's parents were living together at the time of his birth, Eric had to report to federal prison for a 41-month sentence for a drug conviction before Ziyon's first birthday.[3]  Eric's incarceration marked the first of Ziyon's documented adverse childhood experiences.  Overwhelmed by the prospect of raising six children on her own, Mary and

---

[2]    Claire Benack, a staff investigator and trained social worker with the Federal Public Defender's Office, compiled this personal history from review of medical and school records, as well as interviews with Ziyon's mother, father, step-mother, twin sisters, a half sister and a childhood friend.  Her resulting social history report, which provides the basis of this section, was provided to Government counsel on March 20, 2024.

[3] USA vs Eric Thompson, 98-cr-00480-WMN-1

her children moved in with Mary's grandmother.  In 2002, Mary began a job at Johns Hopkins, and she and the children moved back out on their own into a house on Hayward Avenue.  Her three older children were in school, while Ziyon and the twins were in daycare.  As she had feared, supporting a family of six on her own was difficult, and some corners had to be cut.  For a period of time, Mary was scheduled to work overnight shifts at the hospital and was not able to arrange for childcare.  Mary left the younger children in the care of her oldest twins, who were then twelve or thirteen at the time, telling them to call if anything went wrong because the hospital was only ten minutes away.

During this time period, in October 2002, a blood test revealed Ziyon had a lead level of 11 mcg/DL.  This lead level is well above the current CDC reference level of 3.5 micrograms per deciliter used to indicate an elevated lead level.  Doctors in 2002 used a reference level of 10mg/DL, so Ziyon's level was considered elevated even at the time despite the less stringent standard.  Exposure to lead has been associated with many adverse effects including brain and nervous system damage, slowed growth and development, and behavior and learning problems.  Ziyon's lead level triggered an attempted home visit from the Baltimore City Health Department.  Notes from the Health Department indicate they were able to reach Mary by phone, but she was unable to come to the office to discuss Ziyon's lead level because she did not have any days off during the week.  Health Department workers provided her with health education, nutritional counseling, and cleaning instructions and encouraged her to retest Ziyon in January 2003.  The Heath Department did not receive additional lead information from Ziyon until 2012.

In 2003, Ziyon's world changed again when his father returned home from prison. Eric moved back in with the family, but the dynamics of his relationship with Mary had

changed in the time he was away.  Mary recalls that Eric was interested in different get-rich-quick schemes while she really wanted him to have a traditional 9-5 job to provide some stability.  Eric also began gambling, which led him to stay out late at night to the point that he would miss taking the kids to school in the morning.  Mary and Eric were fighting all the time.  Erica remembers that fights would often break out when Eric would get home late, and Mary would try to stab him or hit him as Eric tried to pin her down so she could not hurt him.  The police were called on multiple occasions.  Eriel remembers one night when both of her parents were arrested and taken away.  Mary left a food stamps card and bank card on the table and their older sister in charge of watching them.  Eriel recalls that the kids all sat together and cried because they were so scared, even though their dad ended up coming home later that day.  These experiences of witnessing family members treated violently in the home are another example of an adverse childhood experience witnessed by Ziyon.

From Erica's perspective, it seemed like by the time the three youngest siblings came along, their parents were no longer capable of giving them the attention they needed and deserved.  Their father was often out of the house and their mother would come straight home from work and go into the bedroom, telling the kids not to bother her. Erica describes in her letter:

> Our mother, overwhelmed and exhausted, became emotionally unavailable. I'll never forget how she eventually put a deadbolt on her bedroom door to keep us out—not just physically, but emotionally too.  That kind of emotional distance—the alienation of affection—shaped us at such a young age.  We were often left hungry, unsupported, and scared, but we clung to each other.  And somehow, even in all of that chaos, Ziyon became the one who made us laugh.

*Id.* at 2. Mary's actions were indicative of more than just overwhelm, as Erica reports that Mary has bipolar depression. Growing up in a home with a caretaker struggling with mental illness is yet another adverse childhood experience Ziyon faced.

Meanwhile, their father "was deeply caught up in street life and battled a serious gambling addiction. Many nights, he'd take us to his poker games straight from school, and we wouldn't get home until well after midnight." *Id.* The twins, only 7 years old, were largely responsible for caring for Ziyon, who was 5 years old. They all walked to school together, and if their ride from school was hours late, they figured out what to do. Erica recalls that they had too much free time and no one cared about their whereabouts. Oftentimes they would walk to their paternal grandfather's house after school at the corner of Baker and North Avenue, as his was one of the only escapes they had from their house. Unfortunately, their grandfather passed away when they were still very young. This loss was hard on Ziyon and his siblings emotionally, and it meant they lost an important adult who could help them when their parents were not available. Eric, in his philosophical letter to the Court, points to the death of Ziyon's grandparents as very difficult for his son, who was always seeking affection. **Exhibit 4** (Letter of Eric Thompson-Bey).

Amid this instability at home, Ziyon enrolled in pre-kindergarten at Alexander Hamilton Elementary School. Ziyon always had a lot of energy at home, but his high energy levels quickly became problematic at school as he got in trouble for low-level behavioral problems. Ziyon transferred to James Mosher Elementary midway through first grade and began receiving special education services, including small group instruction for language arts, weekly parent conferences, and counseling. Ziyon was ultimately retained at the end of the 2006-2007 school year and had to repeat first grade.

In April 2007, Mary took Ziyon to a mental health consult at Johns Hopkins. The doctor asked Mary to take him to the Children's Mental Health Center for a more thorough evaluation to ensure his suspected ADHD was not bipolar disorder, given the family history. The doctor prescribed a stimulant. Ultimately, however, his parents took him off the medication and did not keep up with follow-up appointments. The Baltimore City Public Schools conducted its own evaluation, and in the spring of 2007, diagnosed him with ADHD. Based on this testing and Ziyon's struggles in school, a committee formally met to place him on an Individualized Educational Plan ("IEP") in November 2007.

Around this time, Mary and Eric separated for good. Their divorce was yet another adverse childhood experience for Ziyon, bringing up the dosage of his early childhood trauma. When Mary began receiving calls from school about Ziyon, she sent Ziyon to live with Eric because she would not have been able to keep her job if she left every time the school called. Ziyon's connection with his mother was further severed when his mother abruptly moved to Virginia when he was around 8 years old. Mary's fiancé was in the military and was transferred to the Virginia Beach area, so she moved with him. Eric remembers scrambling to get a new place to accommodate all the kids moving in with him. Although Ziyon and the twins knew that Mary would be moving, she never actually told them when she was moving and did not say goodbye. Ziyon remembers learning she was leaving by seeing a social media post of her saying goodbye to Baltimore. Ziyon was absolutely devastated by his mother leaving—and the way she left without saying goodbye. No one in the family thinks he has ever really processed and moved on from her leaving.

Erica writes that their father did the best he could.  But "[h]e, too, was a product of his environment."  **Exhibit 1** at 2.  She says that he would pressure them to give up the little money they earned from summer jobs under the auspices of paying rent or utility bills, but he would gamble their hard-earned money away.  *Id.*  She says, that "[b]y the time he tried to change, it was too late to undo the damage." *Id.*  But he did try.  He became active in the Moorish Science Temple, and he got Ziyon and the twins involved as well.



*Mr. Thompson with his father and sisters at the Moorish Science Temple.*

Ziyon continued to struggle academically, and he was placed in a special program.  One of the educators in the program, Michael Deshields, remembers that after an initial adjustment period, Ziyon took to the program and learned to implement the prosocial skills he needed to return to a general education classroom.  Mr. Deshields was also active in the youth football community in Baltimore and remembers being very proud of Ziyon for his achievements in and out of the classroom.  Ziyon played football through Charm City for years in elementary and middle school.  When he was in about third grade, Ziyon was one of the players selected from players across Baltimore to play on a coalition team against Deion

Sanders's team at an event in Atlanta. Ziyon was a great football player and only stopped



after back-to-back concussions. The long-term impacts of these concussions are unknown, but concussions have been associated with an increased risk of emotional and behavioral problems. In the short-term, Ziyon's sisters remember that quitting football disrupted Ziyon's relationship with Eric, as football was one of the few activities that earned Ziyon Eric's full attention.

The twins say that despite the difficulties at home and school, Ziyon "could find joy in the darkest of situations, and his goal, even as a little boy, was to make people smile." **Exhibit 1** at 1. A tik-tok content creator ahead of his time, Ziyon would film silly videos of himself dancing that amazed his family and friends. Eriel writes, "[w]hen we were bored, sad, or even mad he would do something funny, such as dance and make us smile. It was impossible to be in a bad mood around Ziyon because his natural aura would just brighten your day." **Exhibit 2** at 1.

Ziyon's bubbly personality helped him move through school and the world but did not eliminate his difficulties. While teachers liked him, he continued to struggle with the content of school. Ziyon remained solidly behind grade level in language arts. Eric brought this up in several IEP meetings, including a meeting in 2011 in which he reported that he had hired a tutor on his own to try to help Ziyon since the school was not giving

him the services he needed.  Eric knew Ziyon's future would be limited if he could not read, and in complaints to the school he made clear that he refused to let his son "grow up ignorant."    Dr. DeRight, who reviewed Mr. Thompson's educational records, summarizes his academic profile:

> In January 2012, while enrolled in Edgewood Elementary's PRIDE Program, Mr. Thompson underwent cognitive testing (WISC-IV) that yielded a Full Scale IQ of 88 (Low Average), with index scores of Verbal Comprehension 93 (Average), Perceptual Reasoning 77 (Borderline), Working Memory 83 (Low Average), and Processing Speed 115 (High Average).  Academic testing (Woodcock-Johnson IV) later showed a 4.8-grade equivalent in reading (5-year gap), 8.1-grade equivalent in math (1-year gap), and 4.2 grade equivalent in writing (5-year gap), with stronger math skills and persistent difficulties in reading and writing.  His most recent formal testing (KTEA-II, March 2018) showed a combined reading level at the late 3rd-grade level.

**Exhibit 3** at 9.  Ziyon completed three years of high school, receiving support from his straight-A student sisters who would sit with him in the evenings to try to work with him while they did their own homework.

> ### 2.    Loss after loss compounded, leaving Mr. Thompson vulnerable to negative influences at the time of adolescent brain development, which is perilous for all teens but especially those with ADHD.

As Ziyon reached his teenage years, the pressure to have the things that his peers had intensified.  Eric never worked a traditional 9-5 job, so there would be occasional times when money was plentiful and he could get them all phones, but, more frequently, there was stress about money.  Their necessities were not always covered, and the twins remember coming home on Ziyon's 16th birthday to find the BGE cut off.  Ziyon's childhood best friend, Kirk, lived with the family during this time because Ziyon's stepmother is Kirk's aunt.  Kirk remembers that Eric would always say "no" anytime Ziyon asked for money, even for things like school fees.  Eriel says, "Ziyon grew up without the

luxury of money, so he began to idolize it. This led to him seeking it, and by any means necessary." **Exhibit 2** at 2.

Ziyon tapped into his entrepreneurial skills to try to make his own money. He and Kirk started making juices to sell at their high school, Mergenthaler Vocational Technical High School (known as "Mervo"), which involved walking to Giant every day after school to buy six cases of water and Kool-Aid, followed by three to four hours of preparing drinks to take the next day. Kirk remembers that they got a positive response at first, including from teachers. Ziyon and Kirk would often sell out before lunch daily, and they felt proud that some teachers would buy juice every day. Unfortunately, although the juice was popular, the school did not want them selling juices, in part because they were unsealed packages and because it led to people coming in and out of the wrong classrooms to make purchases.

After Mervo banned him from selling the juices, Ziyon got a job at CVS, where Eriel worked. Ziyon did well for a while, until he started to see other shift workers stealing money by voiding transactions and taking money out of the register. With prom coming up, Ziyon decided to try it himself, in addition to picking up extra shifts. Management quickly caught on because Ziyon did not know how to take money in a sophisticated way. Eriel was disappointed in Ziyon's actions and marks the incident as Ziyon "entering survival mode" at this point with personal finances.

His father's long-time partner, Latarsha Brown, explains that when Ziyon was reprimanded, "He listened, accepted responsibility, and rarely responded with defiance." **Exhibit 5** (Letter of Latarsha Brown). She says that "[t]here were several times when all the kids had misbehaved, but Ziyon would step forward to take the blame—sometimes for actions he didn't even commit—because he didn't want to see his siblings get it trouble."

*Id.* Her daughter Sabrina Christian explains in a letter that even after she and Ziyon had an argument, he volunteered to walk her and her sister home from school after they had an unsettling encounter the day before on the walk home. **Exhibit 6** (Letter of Sabrina Christian). Similarly, step-sister Samanthan Solomon says that she and Ziyon "had each other's backs no matter want." **Exhibit 7** (Letter of Samantha Solomon).

But despite this respect for family, Eric took a tough line with Ziyon, which was very hard for him. For example, when Ziyon and Kirk were in about 10th or 11th grade, they began experimenting with marijuana. They knew that Eric would not approve, so they tried to keep it a secret by smoking outside or in the attic. One particularly cold and snowy day, when they thought they were alone in the house, Kirk and Ziyon decided to smoke in their room while playing video games. When they heard the door open suddenly, they instantly knew they were in trouble. Rather than having a conversation with them or grounding them, Eric came into the room livid, yelling at them both and hitting Ziyon. He made them both pack their things into garbage bags and put them out on the porch. Kirk remembers standing outside on the porch with Ziyon looking at the snow, trying to process what had just happened and what they were going to do. Eric let them back inside because of the weather, but remained firm on kicking them out, and had the twins come pick them up. Ziyon was allowed to come back home after a week, but Kirk was not allowed to come back. Kirk remembers Ziyon crying and pleading with his dad and stepmother not to send Kirk away, and hearing from Ziyon's stepmother that Ziyon was still crying later that day. For some teenagers, this response to using marijuana might just feel like an unpleasant punishment. For someone like Ziyon, though, who had already been abandoned by one parent and had been shown on psychological tests administered as part of the Baltimore City Schools evaluations to be prone to heightened

24

feelings of rejection, sending Kirk away and separating Ziyon from his best friend only served to make him feel more isolated and alone.

Ziyon was teetering on the edge. He remained in school until 12th grade, but "he was 20 years old in the 12th grade, reading at a 3rd-grade level, with math and writing at 7th- and 5th-grade levels, respectively." **Exhibit 3** at 9. On the SATs, he scored only a 730—350 on reading and 380 on math, which is lower than 99 percent of test takers. *Id.* He remained involved in his family's church and became particularly close to the Grand Sheik. The Grand Sheik, referred to as GS in Erica's letter to the Court, became a grandfather figure in Ziyon's life, taking him to the YMCA and making sure he had all the things he needed for school. **Exhibit 1** at 2. Erica says "GS saw Ziyon's potential and gave him something he'd never had before: stability, trust, and unconditional support." *Id.* Sadly, in 2018, GS was diagnosed with Stage 4 cancer and died very quickly. As his father notes in his letter, Ziyon was devastated by his death. **Exhibit 4** at 1. Erica says, "it shattered him." **Exhibit 1** at 2.

After GS's death, Ziyon dropped out of high school two credits short of graduation. **Exhibit 2** at 2. Eriel explains, "Ziyon just could not focus on school. As Maslow's Hierarchy of needs shows, if your basic needs are not met, it is hard to focus on other things. Therefore, Ziyon could not even fathom the importance of education as he just was focused on money so he could make sure that his basic needs were met." *Id.* at 2-3. No longer a homebody making funny dance videos, Ziyon started spending time outside the house with an older crowd. As Eriel explains, "Ziyon is a case of the bad guys getting to him before the good guys could." *Id.* at 2.

Ziyon moved from typical teenage experimenting with marijuana into having full-fledged substance abuse issues. He continued to use marijuana frequently, smoking

multiple times every day.  After dropping out of school, Ziyon also began drinking Lean, a drink made with codeine cough syrup, soda, and hard candy.  Ziyon started drinking it while out with friends and liked the cool feeling that it gave him.  Ziyon also began using Percocet and oxycodone.  At first, he used one pill a day, but as his tolerance progressed, he took more and more. Throughout his childhood, Ziyon had been heavyset.  His mother remembers watching the street change him before her eyes, as he lost a great deal of weight from the opiate usage and would be visibly high when he came to visit.

In March 2020, Ziyon was arrested and charged with handgun on person.  He was detained for a little more than five months and pled guilty for a 3-year sentence with all suspended but time served.  PSR ¶ 34.  During the proceeding, his lawyer stated—and the state's attorney agreed—that should Ziyon complete the 18-month period of probation successfully, he could petition the court to strike the conviction and grant a PBJ.  The judge assented.  Ziyon completed probation, but his lawyer failed to timely file the motion to modify.  But for this error on the part of his lawyer, he would only have 1 criminal history point.

In September 2021, homicide detectives asked Eric to bring Ziyon into the police station, where father and son were informed that the police had reason to believe that Zioyn had been the target of a shooting the night before at a gas station and the assailant seemed to know where Eric lived.  Then Ziyon was shot in the shoulder while sitting in his car.  Doctors thought it best not to remove the bullets, so he left the hospital with two bullets in his left shoulder and one in his left bicep.  Eric observed that after the shooting, Ziyon seemed to go outside every day realizing it could be his last.  Eriel recalls that Ziyon being shot seemed to push him further in the streets, as it made him feel like he was a street guy.  From her perspective, Ziyon was a loyal and good friend, and peer pressure

played a big role in keeping him on the streets. Eriel could tell that his friends were not looking out for Ziyon's best interests, as she remembers them encouraging him to go outside in a highly policed area with no regard for the risk he would be taking.

Eriel's concerns were prescient. In the instant conspiracy, Ziyon was the person who took all the risk: Both Mr. Soto-Diaz and A.M. knew who he was, and he was the only person in communication with A.M.

### 3.    Mr. Thompson's bad decisions must be understood in the context of adolescent brain development compounded by ADHD.

Mr. Thompson was initially evaluated by neuropsychologist Dr. Joette James, and her report was shared with Government counsel on March 20, 2024. Tragically and unexpectedly, Dr. James died last fall. The Defense hired neuropsychologist Jonathan DeRight, Ph.D, to review Dr. James' report and test results, Mr. Thompson's historical education, mental health and medical records, and social history information, and to perform supplemental testing.

At the time of the offense, Ziyon's history and characteristics included most of the factors of youth identified in § 5H1.1: "environment, adverse childhood experiences, substance use, lack of educational opportunities," "impulsive[ity], risk-seeking, and susceptib[ility] to outside influence." U.S.S.C. § 5H1.1. Dr. DeRight explains how these factors combined with Ziyon's "neurodevelopmental challenges, including ADHD, learning disorders, and intellectual impairments," compromised Ziyon's ability to think through the possible consequences of his actions. Like many young people—and especially those with ADHD—he was focused on what he intended and did not give due regard to how it could go awry. The Court well knows the frailties of youth, but Dr. DeRight emphasizes the compounding affects of ADHD. There is no question that Mr.

Thompson suffers from ADHD—he has historical diagnoses long before he became involved in the criminal legal system.  Dr. DeRight explains:

> ADHD is much more than difficulty paying attention; it is primarily a disorder of dysregulation, and it can affect numerous areas including attention, impulsivity, learning, problem solving, and even balance.  For example, postural instability and poor balance are common in ADHD, and this has been implicated in dysfunction of the cerebellum.  Russell Barkley, Ph.D—a prominent expert in ADHD—highlights the role of delayed brain development in executive dysfunction in those with ADHD.  The "30% Rule," as he terms it, refers to the application of scientific studies showing delayed maturation of the brain in individuals with ADHD, which results in an "executive age" that is below one's chronological age.  For example, the "executive age" of a 19-year-old with ADHD is essentially equivalent to the decision-making abilities of a neurotypical 13-year-old.  Adding to these challenges, low self-awareness is common in ADHD, which further compromises one's ability to monitor and adjust behavior.

> Without effective treatment, individuals with ADHD are more likely to make risky decisions and succumb to drug or alcohol abuse even when no "addiction" is present.  "Risky" decisions is somewhat of a misnomer, however.  People with ADHD often make decisions that seem riskier because they have more trouble weighing the pros and cons of a situation and may act on impulse without fully thinking through the possible outcomes.  While risky decisions involve taking chances that could lead to big wins or big losses, people with ADHD are more likely to make suboptimal decisions—choices that have a low chance of turning out well—because they struggle with planning, evaluating consequences, and holding back urges.

**Exhibit 3** at 12.

This is exactly what happened in this case.  Dr. DeRight gave Mr. Thompson various tests—in addition to the tests previously administered by Dr. James—and found his "executive functioning profile is consistent" with what the research would expect.  *Id.* at 13.  "Importantly, Mr. Thompson's functioning should also be understood within the context of adolescent brain development.  Brain maturation continues into the mid-20s, particularly in the prefrontal cortex, which supports impulse control, planning, and decision-making."  *Id.*  Dr. DeRight concludes that, "[t]aken together, Mr. Thompson's

neurodevelopmental, cognitive, and emotional profile paints a picture of an individual whose decision-making deficits, low self-awareness, and susceptibility to impulsivity have been shaped by biological, environmental, and developmental factors." *Id.*

While Mr. Thompson's conduct led to disastrous results in this case, Dr. DeRight makes clear that there is reason for optimism. Guideline § 5H1.1 states that one of the reasons youthfulness may be a basis for a downward departure is because "[y]outhful individuals also are more amendable to rehabilitation." U.S.S.C. § 5H1.1. Because Mr. Thompson will mature and his situation was so exacerbated by a condition—ADHD—which is treatable, his prognosis is good. Dr. DeRight explains that the type of ADHD symptomology at play here

> is responsive to treatment and will likely improve with age. Fortunately, proper treatment for ADHD (e.g., with appropriate medication and/or therapy) has been widely shown to reduce the incidence of drug and alcohol abuse. For this reason, Mr. Thompson has a strong prognosis for improvement in the poor decision-making abilities and processing deficits that were likely implicated in his present legal situation, and effective treatment for ADHD is likely to mitigate those concerns.

**Exhibit 3** at 13.

Dr. DeRight points out that Mr. Thompson has demonstrated motivation for change. He earned his High School Diploma while incarcerated and has completed numerous programs on his tablet, including one on ACEs, on which he took notes to give to Dr. DeRight. **Exhibit 8** (High School Diploma and transcripts); *see* **Exhibit 3** at 9. Since his return to CDF from the Northeast Ohio Correctional Center, he has worked in the kitchen, earning praise from his supervisor for approaching "every task with a positive attitude and a strong work ethic, never, shying away from hard work." **Exhibit 9** (Letter of Lt. Corprew). Lt. Corprew, the dietary supervisor, adds: "Ziyon has taken on increasing responsibility and has become one of the cooks in our department. He has shown a

genuine commitment to learning the craft and improving his skills, which speaks both to his ambition and dedication." *Id.* Dr. DeRight concludes that "[w]ith appropriate interventions, Mr. Thompson has the potential for meaningful improvement in his functioning and a reduced likelihood of reoffending." **Exhibit 3** at 13-14. He recommends that Mr. Thompson engage in "a combination of substance use treatment (commonly available in prison and the community), individual psychotherapy to address the impact of adverse childhood experiences (ACEs), and ADHD medication upon release can provide crucial support for improving impulse control, emotional regulation, and long-term decision-making." *Id.* at 14.

### C. Based on the facts of the case and Mr. Thompson's neurodevelopmental profile at the time of the offense, a significant downward departure is warranted under Application Note 2(B).

Based on the facts set forth above and Mr. Thompson's neurodevelopmental profile at the time of the offense, a downward departure is appropriate. Application Note 2(B) states that when a downward departure is warranted, the departure should not reduce the offense level below that which would prevail for the underlying felony if death had not occurred and, generally, should not fall below 38, the base offense level for second-degree murder. Given the conduct laid out in the Statement of Facts, the corresponding Guideline would be § 2B3.2 (Extortion by Force or Threat of Injury or Serious Damage).

| Base Offense Level | 18 | 2B3.2(a) |
|---|---|---|
| Offense involved kidnapping | +2 | 2B3.2(b)(1) |
| $95,000 < Amount demanded < $500,000<br>($50K cash AND 200 lbs marijuana<br>(@ $1000/pound) = $200,000) | +2 | 2B3.2(b)(2) & 2B3.1(b)(7) |

| If a firearm was discharged | +7 | 2B3.2(b)(3)(A)(i) |
|---|---|---|
| Permanent or life-threatening bodily injury | +4 | 2B3.2(b)(4)(C) would be 6, but (3) and (4) cannot yield more than 11 |
| Person restrained | +2 | 2B3.2(b)(5)(B) |
| Acceptance | -3 | 3E1.1 |
| TOTAL | 27 | |

Notably, because restraint is a specific-offense characteristic, a Chapter 3 adjustment for restraint would not apply. While Application Note 2(B) says it is "not likely to be appropriate" for the offense level to fall below the guideline for second-degree murder (Level 38), because § 2B3.2 included restraint as a specific offense characteristic and still yielded a base offense level below 38, a Chapter 3 adjustment for restraint should not be added to the 38. After 3-levels off for acceptance, Mr. Thompson would have a total offense level of 35.

At Criminal History Category I, the guidelines range would be 168-210; at a Criminal History Category II, the guidelines range would be 188-235. The only reason Mr. Thompson falls within Criminal History Category II is because his retained counsel failed to follow through and request the court strike Mr. Thompson's conviction and replace it with a PBJ after his successful completion of probation. Mr. Thompson lived up to his side of the bargain with the Court; his lawyer did not.

Even if 2 levels are added under § 3A1.3 for restraint of the victim as the Government requests, Mr. Thompson should still have a total offense level of only 37. At Criminal History Category I, his guideline range would be 210-262; at Criminal History Category II, his guidelines range would be 235-293. In either case, the low-end of the c-plea range—20 years—is within the guidelines range that results from a downward

31

departure pursuant to Application Note 2(B) to § 2B1.1.  Accordingly, a sentence at the low-end of the c-plea range is a Guidelines sentence.

## II.    A Sentence Above the Low-End of the C-Plea Range Would Be Greater Than Necessary To Meet the Purposes of Sentencing.

No matter what the technical calculation of the Guidelines are in this case, a sentence of no more than 20 years is appropriate to meet the purposes of sentencing.  Part I's discussion of Application Note 2(B) laid out the nature and circumstance of the offense and the history and characteristics of the defendant, so those facts will not be rehashed here.  Mr. Thompson's age and neurodevelopmental profile are mitigating circumstances that demonstrate that a sentence longer than 20 years would be greater than necessary to meet the purposes of sentencing in this case.

### A.    Specific Deterrence and the Need to Protect the Public

It goes without saying that if the Court sentences Mr. Thompson at the low-end of the c-plea range, he will serve a sentence that is almost as long as he had been alive at the time of the offense.  By the time he is released, the neurodevelopmental tsunami that made Mr. Thompson vulnerable to getting involved in the instant offense without due regard for the potential outcomes will have abated.  Dr. DeRight specifically states that "[w]ith appropriate interventions, Mr. Thompson has the potential for meaningful improvement in his functioning and a reduced likelihood of reoffending." **Exhibit 3** at 13-14.  And, as the Supreme Court has recognized, "a greater possibility exists that a minor's character deficiencies will be reformed … the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (internal

quotation marks omitted).  The Government will be hard-pressed to articulate how the marginal increase of five years is necessary as a specific deterrent or to protect the public.

As discussed above, Mr. Thompson has made significant progress while incarcerated.  He earned his high school diploma, has taken programs on the tablets at the Northeast Ohio Correctional Center and Chesapeake Detention Facility ("CDF"), and is earning rave reviews as a cook in the kitchen at CDF.  Mr. Thompson has been moved by how his family and religious community have stood by him even though he engaged in a course of conduct that ended in a man losing his life, and he wants to change his life to live up to their example.  Erica writes,

> [s]ince his arrest, I've seen a real change in Ziyon.  Every Sunday, we call and do Bible study together.  We talk about faith, repentance, healing, and about the man he wants to become.  He's taken full accountability for his choices and understands now how quickly one bad decision can change everything.  He no longer glorifies the street life.  He wants better. And I believe he will get there.

**Exhibit 1** at 3.  His father, too, says "this situation was a true wake-up call," and Ziyon has been praying "to his higher power asking for forgiveness and the knowledge to assist him with getting back to him being a spiritual person."  **Exhibit 4**.

Members of his religious community have written to the Court to make clear that "[h]e is still a member of the Moorish Science Temple of American and will remain such." **Exhibit 10** (Letter of Robin Carroll-EL).  Assistant Grand Sheikess Katrina Johnson-Bey writes that when Ziyon returns home, "[h]e has plenty of family (spiritually and biologically) that is willing to support him and to assist him with staying on the right track."  **Exhibit 11** (Letter of Katrina Johnson-Bey).  Natasia Thames-Bey points out that "[t]here are so many events and opportunities that the Moorish Science Temple host throughout the year that will keep Ziyon active with helping the youth and the community.

Also, we have brotherhood meetings that he can attend, that can assist him in achieving his goals and help him stay in line and out of trouble." **Exhibit 12** (Letter of Natasia Thames-Bey). Sheik Clarence Prather-El, who would like to address the Court at sentencing, notes that Mr. Thompson has law-abiding, love-thy-neighbor influences. **Exhibit 13** (Letter of Cheik Clarence Prather-EL).

In addition to his spiritual community, Mr. Thompson has a supportive family waiting for him. Today, his mother is a flight attendant and Jehovah's Witness, who remains supportive of her son. **Exhibit 14** (Letter of Mary Degraffinried). His father owns several small businesses and is active in the Moorish Science Temple. And his sisters are thriving. Both Erica and Eriel understand the gravity of what Ziyon has done and stand ready to help him whenever he is released. Erica wants Ziyon to come live with her in suburban Illinois whenever he is released. She explains:

> This situation has been incredibly painful for me—not just because of Ziyon's incarceration, but because I have deep sorrow for the victim and their family. I grieve for the life lost, for the trauma they now carry, and for the ripple effect of pain that will never fully go away. I often find myself thinking about how different things could have been if we had grown up in a safer, more nurturing environment. I carry immense guilt that I couldn't pull Ziyon out in time, that I couldn't protect him or prevent this outcome. I wish so much had been different—not to excuse his actions, but to acknowledge that cycles of violence and neglect set so many young men up to fail. My heart aches for everyone involved. And while I stand by my brother and believe in his ability to change, I also hold an immense amount of space for the gravity of what happened and the devastation that it caused to the victim's family.
>
> . . .
>
> When he is released, I want him to come live with me and my family [in suburban Illinois]. I currently have a loving husband and three wonderful children who are ready to welcome him with open arms, completely without judgment when the time comes. We want to help him rebuild. I want him to see what it's like to live outside of survival mode—to live in a space where he doesn't have to look over his shoulder. Where there's structure, safety, and peace. He deserves that. And I am ready to walk that journey with him.

> Ziyon is not defined by his past.  He is defined by his resilience, his heart,
> and his willingness to change.  I truly believe he can be a productive, thriving
> member of society.  He has always had the heart—now he just needs the
> opportunity.

**Exhibit 1** at 3.

At the sentencing hearing, Sheik Prather-El, Mr. Thompson-Bey and Mr. Thompson's sisters would like to briefly address the Court.  But, most importantly, Mr. Thompson would like to allocute to express his true remorse and capacity for change. After hearing from him, the Court will conclude that a sentence at the low-end of the c-plea range is sufficient in this case as a specific deterrent and to protect the public.

### B.    Rehabilitation

Dr. DeRight has laid out the treatment that Mr. Thompson needs: substance abuse treatment, psychotherapy to address his adverse childhood experiences, and medication for ADHD.  While some of this could be provided in custody, the Supreme Court has made clear that the need for rehabilitation cannot justify a longer period of incarceration.  *See Tapia v. United States*, 564 U.S. 319, 332 (2011) ("Section 3582(a) precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation.").

### C.    Retribution

We recognize that Miguel Soto-Diaz lost his life, his wife lost her husband, and his children lost their father.  And we understand Mr. Thompson, though he did not shoot Mr. Soto-Diaz, bears moral and legal responsibility for the chain of events that ended in Mr. Soto-Diaz's death.  Mr. Thompson and his family fully acknowledge the gravity of what he has done.  But a sentence that reflects the seriousness of the offense, promotes respect for the law and provides just punishment must account for the fact that Mr.

Thompson did not intend for Mr. Soto-Diaz to die, Mr. Thompson's youth, and his neurodevelopmental profile. As explained in the Guidelines section, there is widespread understanding that young people are less culpable for their actions and, at the very least, youth is a mitigating factor. It would neither promote respect for the law nor provide just punishment if the Court's sentence did not duly account for Mr. Thompson's youth and lack of intent.

Comparing Mr. Thompson's conduct and mitigating circumstances with other recent sentencings in cases involving homicide demonstrates that a 20-year sentence is appropriate to balance the seriousness of the offense, promote respect for the law and provide just punishment.

In *United States v. Collin Davis*, the defendant shot the victim at close range in a vehicle during a struggle. Mr. Davis was in his 30s, distinguishing him from Mr. Thompson. And while Mr. Davis, like Mr. Thompson, did not start the evening with an intent to kill, he, unlike Mr. Thompson, was the one who pulled the trigger. The victim of that offense, like Mr. Soto-Diaz, was part of a drug conspiracy. If Mr. Davis, who was older than Mr. Thompson and pulled the trigger, received 25 years, Mr. Thompson should receive 20.

In December 2020, Judge Grimm sentenced Justin Antoine to 270-months imprisonment after he admitted to walking into a recreation center and fatally shooting a juvenile twice in the head in retaliation because he believed the victim had previously robbed him of drugs that he had been selling illegally as part of a drug conspiracy. *See United States v. Justin Antoine*, No. PWG-19-0140, ECF No. 349 (D. Md. Dec. 3, 2020).

In another well-publicized case, the Court sentenced the defendant, who admitted to firing multiple gunshots at individuals in a vehicle, one of which missed and tragically

36

struck and killed a three-year-old child, to 25-years incarceration.  *See United States v. Plummer*, No. GLR-17-0223, ECF No. 460.

In 2017 through 2019, Judge Russell imposed sentences of 25 years or slightly less in *United States v. Alewine et al.*, No. GLR-16-0453, even though defendants in that case admitted to multiple shootings.  Keenan Lawson, for example, was sentenced to 23 years despite admitting to killing an innocent bystander and to shooting two other individuals in attempts to murder them.  *See* Plea Agreement, ECF No. 604. If these defendants who committed multiple shootings received 25 years, Mr. Thompson should receive 20.

In *United States v. Kevin Alexis Hernandez-Guevara*, No. PX-17-0382, the Court sentenced the defendant, an MS-13 member who helped lure a victim to a secluded location where gang members shot, assaulted, and fatally stabbed him and, in another incident, shot and stabbed two victims, causing them to sustain serious and life-threatening permanent injuries, to 24.3 years.  *See* Plea Agreement, ECF No. 192.

In *United States v. Moreno-Martinez, et al.*, No. PX-17-0154, three MS-13 gang members pleaded guilty to a conspiracy to kidnap, but their actual conduct involved premeditated murder of a victim.  The leader, Neris Moreno-Martinez, received a sentence of 30 years, and his co-conspirators, Jose Melendez-Rivera and Reynaldo Granados-Vasquez, each received sentences of 20 years.

In *United States v. Miguel Lopez Abrego*, No. JKB-16-0259, the Court sentenced the defendant to 300 months after he admitted to his participation in a violent racketeering conspiracy, including bringing Victim 13 to Wheaton Regional Park, where he and other MS-13 members had dug a grave and, with others, he attacked the victim with a machete and knives until he was dead.  *See* Plea Agreement, ECF No. 543 at 10. In the same case, Judge Bredar sentenced Francisco Ramirez Pena to 300 months after he,

too, admitted to participating in the racketeering conspiracy, as well as joining other MS-13 members in fatally stabbing with machetes and knives a woman believed to be a rival gang member.  No. JKB-16-0259, ECF No. 552 at 10.  And co-defendant Edwin Ruiz Urrutia also received a 300-month sentence for his participation in the RICO conspiracy and joining with Pena in killing the woman believed to be a rival gang member.  No. JKB-16-0259, ECF No. 657.

If individuals who are older than Mr. Thompson, did not have his compromised neurodevelopmental profile, and killed someone, mostly with the intent to do so, received 25 years, balancing the mitigating factors in this case, a 20-year sentence is appropriate. Given the numerous Supreme Court cases recognizing the mitigating circumstances of youth, a sentence that acknowledges the role that Mr. Thompson's youth and neurodevelopmental profile played in the offense promotes respect for the law and just punishment.

### D.    General Deterrence

A sentence of 20 years, one-year less than the number of years Mr. Thompson had been alive when he engaged in this crime, would send a very strong deterrent message. The fact that Mr. Thompson was charged federally, apprehended within a month of the offense, detained pretrial for almost three years, and faces a sentence as long as he has been alive sends a clear deterrent message that whether or not you are the shooter, no matter your intent, you will be significantly punished.  Indeed, the Department of Justice National Institute of Justice has stated, "The *certainty* of being caught is a vastly more powerful deterrent than the punishment."  U.S.D.O.J., National Institute of Justice, *Five Things About Deterrence*, available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence (May 2016) (emphasis in original).

***

From the day he was arrested, Mr. Thompson has understood he must face serious consequences for Mr. Soto-Diaz's death. He knows that even though he did not shoot Mr. Soto-Diaz, he bears responsibility for his death. But he does not need a sentence that is longer than he has been alive thus far as a specific deterrent. He has deep remorse and, as Dr. DeRight notes, he has a positive prognosis for the future. While the offense is certainly grave, the sentence must reflect Mr. Thompson's youth, neurodevelopmental profile and lack of intent. A sentence at the low-end of the c-plea range is the appropriate one in this case.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland
                    /S/

_____
SASHA GARCON (#817494)
KATHERINE TANG NEWBERGER (#27803)
Assistant Federal Public Defenders
Office of the Federal Public Defender
100 South Charles Street
Tower II, 9th Floor
Baltimore, Maryland 21201
Phone: (410) 962-3962
Fax: (410) 962-0872
Email: sasha_garcon@fd.org
          katherine_newberger@fd.org